UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | 2:21-cr-00015-JDL-4 |
| | ) | |
| DEREK DAPRATO, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON DEFENDANT DEREK DAPRATO'S MOTION TO SUPPRESS**

The indictment in this case (ECF No. 115) alleges that Defendants Jason Candelario, Luis Carpio, Andrew Soboleski, and Derek Daprato engaged in a Hobbs Act robbery conspiracy to violently steal marijuana and the proceeds of marijuana sales, among other crimes.[1] Daprato moves (ECF No. 179) to suppress all of the evidence seized from a search of his Facebook account. He argues that (1) FBI Task Force Officer Kyle Kassa's affidavit in support of the application for a search warrant failed to establish probable cause for any search of the account; (2) the warrant violates the Fourth Amendment's particularity requirement; and (3) the good-faith exception does not apply. For the reasons I will explain, I deny the motion.

---

[1] Count One of the indictment charges all four defendants with conspiring to commit Hobbs Act robbery. *See* 18 U.S.C.A. § 1951(a) (West 2022). Count Two charges Daprato and two codefendants with interfering with commerce by violence and aiding and abetting the same. *See id.* Count Three charges Daprato and two codefendants with discharging a firearm during a crime of violence and aiding and abetting the same. *See* 18 U.S.C.A. § 924(c)(1)(A) (West 2022). Count Four charges Daprato and two codefendants with brandishing a firearm during a crime of violence and aiding and abetting the same. *See id.* Counts Five and Six charge two codefendants with being felons in possession with firearms and ammunition. *See* 18 U.S.C.A. § 922(g)(1) (West 2022).

1

## I. BACKGROUND

In support of a warrant application to search Daprato's Facebook account, Officer Kassa submitted an affidavit describing an investigation arising out of an early-morning 911 call. The affidavit recounts how officers arrived at a Maine residence on August 3, 2019, to find a man who had been shot in the abdomen; his girlfriend, A.M.; and another woman, J.M. According to J.M., the three had returned after an evening out when they were ambushed by two masked men in the garage. During the fight that ensued, the male victim was shot. The masked men then fled.

Video and audio recordings from surveillance equipment at the home show two masked men arriving at 12:26 a.m. with a backpack. The three victims arrive 10 minutes later. After sounds of a struggle and a gunshot, the masked men flee at 12:38 a.m. One of them appears to be carrying a handgun.

The men left without their backpack, and the backpack's contents—duct tape, zip ties, and plastic bags—suggested their intention to commit a robbery. Because the masked men had arrived 10 minutes before the victims and because the men positioned themselves at the garage door a mere four minutes before the victims' return, without appearing to surveil the home, Officer Kassa concluded that the men were likely acting on information about the victims' location.

Eight minutes after the men fled, a nearby police cruiser's license-plate reader logged a passing car registered to Defendant Carpio, who had previously been convicted of robbery. DNA recovered from one of the zip ties left at the scene was eventually matched to Carpio.

On September 19, 2019, Carpio's domestic partner told law enforcement that, on the night of August 2, 2019, Carpio had lent his car to a person she knew as "Candy." She provided a physical description of Candy. Local officers familiar with Carpio's domestic partner believed that Candy was Defendant Candelario, someone the officers thought may have previously engaged in criminal activity with her. Carpio's partner also recounted how, on August 3, she woke up to find that the car had been returned with a muddy interior, and that she had found masks and zip ties inside the car. She described how, on August 30, Candy contacted Carpio over Facebook and asked Carpio to have her contact Candy about what had happened to the items left in the car. She also reported hearing a conversation between Carpio and Candy in which they discussed a man being shot in the shoulder, a screaming woman, a garage, and Candy running through the woods with another man she knew as "Sobo."

A search of Carpio's Facebook account revealed that Carpio was "friends" with "Andrew Sobo." On November 20, 2019, Officer Kassa interviewed Defendant Soboleski, whose appearance matched the profile pictures of the "Andrew Sobo" account. Soboleski denied involvement with the crime but acknowledged his association with Carpio and Candelario. Cell phone data obtained by the FBI show that Carpio's, Candelario's, and Soboleski's cell phones traveled from New Hampshire to Maine on the night of August 2, 2019, and that, when the crime occurred, all three phones were serviced by the same towers that serve the scene of the crime.

Turning to the evidence concerning Defendant Daprato, Daprato's phone interacted with Candelario's before and after the crime. As previously noted, the

masked men arrived at the residence at 12:26 a.m. on August 3, the victims arrived at 12:36 a.m., and the men fled at 12:38 a.m.  Daprato's and Candelario's phones interacted through five voice calls and 15 texts between 8:57 p.m. on August 2 and 12:21 a.m. on August 3, including calls at 12:08 a.m., 12:14 a.m., 12:21 a.m., and 12:28 a.m.  Their phones also interacted by voice calls at 12:39 a.m. and 12:40 a.m.  At approximately 12:42 a.m., Candelario's phone called Daprato's, Daprato's called Candelario's, and Candelario's called Soboleski's.  The three phones continued to interact until 2:28 a.m.[2]

When officers reviewed J.M.'s phone records, they found a combined 1,200 text messages and voice calls between her phone and Daprato's during July and August 2019.  Fifteen of those texts were on the night of August 2, with the last at 9:04 p.m.

On August 2, Daprato's phone stopped sending text messages at approximately 11:48 p.m. and did not resume texting until about 9 a.m. on August 3.  In Officer Kassa's experience, it is common for individuals involved in criminal activity to switch their communications to platforms that they believe to be more secure, including Facebook, before and during the commission of crimes.

On Daprato's public Facebook page, there were many photographs of him and Candelario together.  Some of those photos were from August 2019.  Comments on Daprato's public photos also revealed regular interactions between Daprato and A.M., including interactions during September 2019.

---

[2] Less relevant to the instant motion, Carpio's and Soboleski's phones interacted through four voice calls from 8:43 p.m. through 9:12 p.m. on August 2.  Candelario's and Soboleski's phones interacted through five voice calls, 16 texts, and one picture message on August 2 between 8:52 p.m. and 9:37 p.m.

4

Officer Kassa cited the foregoing information as providing probable cause to believe that violations of 18 U.S.C.A. § 1951 (West 2022) (Hobbs Act robbery) and 18 U.S.C.A. § 924(c) (West 2022) (possession of a firearm during an in relation to a crime of violence) had occurred, and that evidence of those crimes would be found by searching Daprato's Facebook account. The Magistrate Judge signed a warrant authorizing a search of information associated with Daprato's Facebook account, which was identified by its URL. The warrant specifies 17 categories of information that Facebook was to disclose for the time period between August 1, 2019 (right before the alleged crime) and December 26, 2019 (the date of the warrant). The categories are:

1. All contact and personal identifying information, including: full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers[;]

2. All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

3. All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

4. All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

5. All records or other information regarding the devices and internet browsers associated with, or used in connection with,

that Facebook account, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

6. All other records and contents of communications and messages made or received by the user, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

7. All "check ins" and other location information;

8. All IP logs, including all records of the IP addresses that logged into the account;

9. All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

10. All information about the Facebook pages that the account is or was a "fan" of;

11. All past and present lists of friends created by the account;

12. All records of Facebook searches performed by the account;

13. All information about the user's access and use of Facebook Marketplace;

14. The types of service utilized by the user;

15. The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

16. All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

17. All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

ECF No. 210-2 at 4-6.

The affidavit explains that, in Officer Kassa's experience, the information that Facebook was asked to disclose may provide evidence of the who, what, when, where, and how of the suspected violations of 18 U.S.C.A. § 1951 and 18 U.S.C.A. § 924(c). Facebook account activity, such as IP logs, can provide investigators with a user's physical location at a moment in time. Similarly, other Facebook features allow users to geolocate themselves, including by tagging themselves at a location. According to the affidavit, other requested information might provide insight into a user's state of mind as it relates to the crime or might constitute evidence of who used or controlled the account.

Finally, the warrant states that the Government could seize, from the information Facebook was to disclose, the fruits, evidence, and instrumentalities of violations of 18 U.S.C.A. § 1951 and 18 U.S.C.A. § 924(c). It specifically identified information related to:

1. The attempted robbery that occurred on August 3, 2019 in York, Maine.

2. Efforts to destroy or conceal evidence of the robbery.

3. Communications relating to the planning of the robbery.

4. Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner.

5. Evidence indicating the Facebook account owner's state of mind as it relates to the crimes under investigation.

6. The identity of the person(s) who created or used the username, including records that help reveal the whereabouts of such person(s).

>   7. The identity of the person(s) who communicated with the username about matters relating to the robbery or use/possession of any firearms to be used in the robbery.

ECF No. 210-2 at 7.

## II.  PROBABLE CAUSE

A warrant application must demonstrate probable cause that a crime has been committed and probable cause that evidence of that crime exists at the place to be searched. *United States v. Cordero-Rosario*, 786 F.3d 64, 69 (1st Cir. 2015). To determine whether a sufficient nexus exists between the suspected crime and the place to be searched, "the task of the issuing magistrate is to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* (alterations omitted) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "The question is whether evidence of the crime is likely to be found in the specific place being searched, not whether the crime occurred there." *United States v. Joubert*, 778 F.3d 247, 252 (1st Cir. 2015). "[T]he facts presented to the magistrate need only 'warrant a man of reasonable caution' to believe that evidence of a crime will be found." *United States v. Feliz*, 182 F.3d 82, 86 (1st Cir. 1999) (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983)).

A magistrate judge's initial evaluation of a warrant application is due "significant deference," and a court should reverse only if it sees "no 'substantial basis' for concluding that probable cause existed." *Cordero-Rosario*, 786 F.3d at 69 (quoting *United States v. Ribeiro*, 397 F.3d 43, 48 (1st Cir. 2005)). A court's review is limited to the facts and supported opinions within the affidavit itself. *United States v. Austin*,

991 F.3d 51, 55 (1st Cir. 2021). "[W]here, as here, a search is conducted pursuant to a warrant, the burden falls to the defendant to show the absence of probable cause by a preponderance of the evidence." *United States v. Lopes*, CRIMINAL ACTION NO. 20-10244, 2021 WL 6197288, at *2 (D. Mass. Dec. 30, 2021) (quoting *United States v. Heyer*, CRIMINAL ACTION NO. 15-10256, 2018 WL 6834591, at *1 (D. Mass. Dec. 27, 2018)); *accord United States v. Paradis*, 351 F.3d 21, 27-28 (1st Cir. 2003) ("[F]ederal courts follow the rule that 'if the search or seizure was pursuant to a warrant, the defendant has the burden of proof.'" (quoting 5 Wayne R. LaFave, *Search and Seizure: A Treatise on The Fourth Amendment* § 11.2(b) (3d ed. 1996))).

Daprato first argues that the affidavit does not establish probable cause to believe that his Facebook account would contain any evidence of violations of 18 U.S.C.A. § 1951 or 18 U.S.C.A. § 924(c). Daprato cites the absence of (1) evidence related to Daprato from the prior search of Carpio's Facebook account, (2) witness statements suggesting that Daprato messaged with his codefendants via Facebook, and (3) criminal implications from the publicly viewable photos of him and Candelario or interactions with A.M. Daprato further asserts that the affidavit's description of the calls and texts among the codefendants' phones, including the period in which Daprato's phone was calling and not texting, affirmatively suggests that Daprato was not using Facebook to communicate during that time period.

The Government responds that probable cause existed to search the account because Daprato's and Candelario's phones communicated immediately before and immediately after the crime; Daprato's public Facebook page displayed photos of him and Candelario; Daprato's phone had extensive contacts with J.M.'s, including on the

9

night of August 2; and Daprato's public Facebook page revealed interactions with A.M. The Government also contends that probable cause was supported by Daprato's phone's shift from texting and calling to only calling, combined with Officer Kassa's experience about how people sometimes switch their communication platforms before and during crimes.

I agree with the Government that the Magistrate Judge had a substantial basis for concluding that, under all of the circumstances, there was a fair probability that evidence of violations of 18 U.S.C.A. § 1951 or 18 U.S.C.A. § 924(c) would be found from a search of Daprato's Facebook account. According to the affidavit, on the eve of the crime, Candelario borrowed the car that was logged near the crime scene. Instrumentalities of the crime, including masks and zip ties, were discovered in the car the next morning. Candelario and Carpio were overheard discussing events that closely resemble the crime. Carpio's DNA was found at the scene. The cell phones of Candelario, Carpio, and Soboleski were in the vicinity of the crime when it happened. Daprato's and Candelario's phones interacted just before and just after the crime. Daprato's phone also interacted with J.M.'s on the night of the crime, which might have been how the masked men appeared to know when the three victims would be arriving. Daprato's public Facebook page connected him to both Candelario and A.M. *See United States v. Whitt*, Case No. 1:17cr060, 2018 WL 447586, at *2 (S.D. Ohio Jan. 17, 2018) ("[C]ontent of the public accounts leads rationally to the conclusion that the private accounts contain similar or even more inculpatory evidence." (quoting *United States v. Arnold*, Case No. 15-20652, 2017 WL 4036312, at *2 (E.D. Mich. Sept. 13, 2017))). Finally, the shift in the pattern of communications by

Daprato's phone on the night of the crime suggests that Daprato may have switched from texting to Facebook. Such a switch would align with Officer Kassa's observation about the communication patterns of persons engaged in criminal activity. *See Feliz*, 182 F.3d at 87 (noting that a magistrate is "entitled to accord some weight" to an officer's "experience and opinions").

Under these circumstances, a person of reasonable caution would believe there was a fair probability that Daprato's Facebook account contained evidence of a Hobbs Act robbery or possession of a firearm during a crime of violence. Among other potentially incriminating information, Daprato's Facebook account might reasonably have been thought to contain evidence of his communications with the codefendants before, during, and after the crime; his location during that same period; the relationships between him and coconspirators; communications between him and the victims; and his relationships with the victims.

### III.  PARTICULARITY

"The Fourth Amendment unambiguously requires that warrants 'particularly describe the place to be searched, and the persons or things to be seized.'" *United States v. Moss*, 936 F.3d 52, 58 (1st Cir. 2019) (alteration omitted) (quoting *Groh v. Ramírez*, 540 U.S. 551, 557 (2004)). The purpose of this particularity requirement is to prevent wide-ranging general searches by the police. *Id*. "The particularity requirement demands that a valid warrant: (1) must supply enough information to guide and control the executing agent's judgment in selecting where to search and what to seize, and (2) cannot be too broad in the sense that it includes items that should not be seized." *United States v. Kuc*, 737 F.3d 129, 133 (1st Cir. 2013).

11

Daprato does not argue that the warrant was ambiguous in describing the property to be searched or seized; rather, he contends that the warrant was overbroad because it required Facebook to disclose data that the Government lacked probable cause to believe would contain evidence of the enumerated crimes.[3] "The Fourth Amendment requires that a warrant be 'no broader than the probable cause on which it is based.'" *United States v. Hurwitz*, 459 F.3d 463, 473 (4th Cir. 2006) (quoting *United States v. Zimmerman*, 277 F.3d 426, 432 (3d Cir. 2002)); *accord United States v. Galpin*, 720 F.3d 436, 446 (2d Cir. 2013). "The probable-cause nexus between enumerated evidence of the crime and the place 'can be inferred from the type of crime, the nature of the items sought, the extent of an opportunity for concealment and normal inferences as to where a criminal would hide evidence of a crime.'" *United States v. Rodrigue*, 560 F.3d 29, 33 (1st Cir. 2009) (alteration omitted) (quoting *Ribeiro*, 397 F.3d at 49). The belief that evidence of a crime will be found in the place to be searched does not need to be more likely true than false. *Joubert*, 778 F.3d at 252. "As is the case with challenges to the validity of search warrants generally, a defendant bears the burden of showing that a search warrant is overbroad." *United States v. Clark*, Criminal No. 10–62–P–S, 2010 WL 4365562, at *11 (D. Me. Oct. 27, 2010).

Daprato identifies categories of data for which he contends the Government lacked probable cause entirely: his Facebook Marketplace data, his "likes," his past

---

[3] Daprato frames the issue as whether the Government could require Facebook to disclose his "entire digital life on Facebook." ECF No. 179 at 10. However, the record does not allow me to determine whether the warrant required Facebook to disclose all or only a subset of the information related to Daprato's account.

12

and present "friends," the pages of which he is a "fan," and his Facebook search history. He also asserts that, if the Government had probable cause with respect to Daprato's Facebook communications, the warrant was overbroad because the Government did not limit its request to those communications between Daprato and his codefendants and the victims.[4]

The Government responds that Daprato has not provided any basis for his conclusion that the categories of data that he identifies were unlikely to contain relevant evidence. The Government asserts that there was probable cause to believe that searching Daprato's "friends" might uncover additional evidence of his relationships with Candelario and A.M., which could be evidence of Daprato's role in the robbery. The Government also argues that knowing Daprato's "likes" and the pages of which he is a "fan" could illuminate the connectivity between Daprato and Candelario. The Government further contends that the warrant was not overbroad because it was limited in time to approximately five months of data beginning a few days before the attempted robbery.

Daprato has not carried his burden to show that the Magistrate Judge lacked a substantial basis to find that the Government could conclude with fair probability that the disputed categories of information would contain evidence of the enumerated crimes. *Cf. United States v. Crooker*, 688 F.3d 1, 8 (1st Cir. 2012) ("In general, 'any container situated within residential premises which are the subject of a validly-

---

[4] Because Daprato bears the burden to show overbreadth, I consider his challenge only with respect to data for which he has offered a developed argument. *See In re Light Cigarettes Mktg. Sales Pracs. Litig.*, 271 F.R.D. 402, 422 n.16 (D. Me. 2010) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990))).

13

issued warrant may be searched if it is reasonable to believe that the container could conceal items of the kind portrayed in the warrant.'" (quoting *United States v. Rogers*, 521 F.3d 5, 9-10 (1st Cir. 2008))). Given the information the Government already had from Daprato's public Facebook page about his relationships with Candelario and A.M., it was reasonable to suspect that searching his "friends," his "likes," and the pages of which he is a "fan" would reveal additional connections with the codefendants or victims. Evidence connecting a defendant to his codefendants or victims, even "innocuous[ly]," is evidence of a crime because it "preclude[s] the possibility that [the defendant] never knew nor was in contact with" them. *Joubert*, 778 F.3d at 253 (citing Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.")). And, in light of the independent information potentially linking Daprato to the crime and the fact that the masked men appeared to know when the victims would be arriving at the house, it was reasonable to infer that Daprato's Facebook search history would contain evidence of the crime, as he might have monitored the victims' locations by searching for and then viewing their Facebook pages.[5]

Additionally, the absence of temporal limits has been a primary concern of those courts that have held or suggested without holding that Facebook-related

---

[5] The parties have stipulated (ECF No. 224) that neither intends to introduce evidence obtained from the search of the Facebook Marketplace data, so I need not address whether probable cause existed with respect to this specific category. Assuming, hypothetically, that probable cause were missing as to the Facebook Marketplace data, it would not result in the suppression of the other data seized pursuant to the warrant for which there was probable cause. *See infra* note 7. Furthermore, as addressed later in this decision, the search of Daprato's Facebook data—including the Facebook Marketplace data—is subject to the good-faith exception. *See infra* Section IV.

warrants were overbroad. *See, e.g.*, *United States v. Burkhow*, No. 19-CR-59, 2020 WL 589536, at *10 (N.D. Iowa Feb. 6, 2020) ("Some reasonable attempt could have been made to narrow the scope of this search, particularly by setting date limitations if not restrictions to specific account activities or interactions with particular persons."); *United States v. Chavez*, 423 F. Supp. 3d 194, 207 (W.D.N.C. 2019) ("[T]he Government compelled Facebook to disclose sixteen broad categories of evidence, without limiting disclosure to the purported members or purported dates."); *United States v. Shipp*, 392 F. Supp. 3d 300, 310 (E.D.N.Y. 2019) ("[Including a temporal limitation] could have mitigated the court's concerns about the breadth of this warrant."). Here, the warrant was limited to five months of data beginning right before the crime. *See United States v. Jones,* Case No. 19-CR-341, 2021 WL 960910, at *4 (D. Minn. Mar. 15, 2021) ("Unlike in *Burkhow*, in which the warrant to search and seize information had no temporal limitations, here the warrant to seize information on [the defendant's] Facebook account was temporally limited.").

Finally, I reject the argument that the warrant was overbroad for failing to limit Facebook's disclosure to only those communications between Daprato and his codefendants and the victims. Some courts have concluded that searches are overbroad if the Government requests an entire category of data from a company and it would have been possible, given the nature of the data and the capabilities of the company, to seek "only those [data] the government has probable cause to search." *In re Search of Info. Associated with Four Redacted Gmail Accts.*, 371 F. Supp. 3d

15

843, 845 (D. Or. 2018).[6] However, a court in this District previously explained that "[t]he Fourth Amendment does not require the government to delegate a prescreening function to the internet service provider or to ascertain which e-mails are relevant before copies are obtained from the internet service provider for subsequent searching." *United States v. Taylor*, 764 F. Supp. 2d 230, 237 (D. Me. 2011).

Under the facts of this case, it is not necessary for me to choose between these disparate approaches. Daprato has not shown that the Magistrate Judge lacked a substantial basis to conclude that probable cause existed for all of his Facebook communications from August 2019 to December 2019. Given the extent of the information the Government had suggesting Daprato's possible participation in the enumerated crimes, in part from communications visible on his public Facebook page, a fair probability existed that any individual Facebook communication from the five-month period would contain relevant evidence, such as messages implicating additional participants. *Cf. United States v. Griffith*, 867 F.3d 1265, 1274 (D.C. Cir. 2017) ("Because the information on a cell phone can enable reconstruction of the 'sum of an individual's private life,' the police often might fairly infer that a suspect's phone contains evidence of recent criminal activity, perhaps especially when, as here,

---

[6] *Accord Burkhow*, 2020 WL 589536, at *8 ("[G]iven the wide array of personal information contained in an individual's social media account and the platform's ability to fulfill specific data requests, search warrants for social media profiles 'can and should be targeted and particular.'" (quoting *United States v. Hamilton*, Criminal Action No. 6:18-CR-57-REW-10, 2019 WL 4455997, at *4 (E.D. Ky. Aug. 30, 2019))); *see also In re Warrant for All Content & Other Info. Associated with the Email Acct. xxxxxxx gmail.com Maintained at Premises Controlled By Google, Inc.*, 33 F. Supp. 3d 386, 394 (S.D.N.Y. 2014) ("There might be some force to requiring an email host to cull emails from an email account where a limitation in the scope of the items to be seized would allow the email host to produce responsive material in a manner devoid of the exercise of skill or discretion . . . .").

multiple perpetrators may have coordinated the crime." (citations omitted) (quoting *Riley v. California*, 573 U.S. 373, 394 (2014))).

For the foregoing reasons, Daprato has not met his burden to show that the warrant was lacking in particularity or overbroad.

### IV. GOOD FAITH

The Government contends that even if I were to determine that the warrant was defective, the good-faith exception to the exclusionary rule would preclude the suppression of the seized evidence. "[D]ue to the significant costs of suppressing evidence of crimes, the exclusionary rule applies 'only where its deterrence benefits outweigh its substantial social costs.'" *United States v. Levin*, 874 F.3d 316, 322 (1st Cir. 2017) (alteration omitted) (quoting *Utah v. Strieff*, 579 U.S. 232, 237 (2016)). "[W]hen the police act with an objectively reasonable good-faith belief that their conduct is lawful . . . the deterrence rationale loses much of its force, and exclusion cannot pay its way." *Id.* (quoting *Davis v. United States*, 564 U.S. 229, 238 (2011)). The good-faith exception to the exclusionary rule provides that evidence need not be suppressed if the officer executing the warrant acted in objectively reasonable reliance on a warrant issued by a neutral and detached magistrate. *Cordero-Rosario*, 786 F.3d at 72. It is the Government's burden to show good faith. *United States v. Echevarría-Ríos*, 746 F.3d 39, 41 (1st Cir. 2014).

If probable cause were missing with respect to some of the data that Facebook was required to disclose, I would find that the good-faith exception applies. Contrary to what Daprato argues, the affidavit was not so lacking in probable cause and the warrant was not so lacking in particularity as to make reliance on the warrant

17

objectively unreasonable. *See United States v. Leon*, 468 U.S. 897, 923 (1984). Reliance on the warrant was reasonable because "[t]he Affidavit articulated probable cause to search at least certain categories of information or services associated with the Facebook account," *Shipp*, 392 F. Supp. 3d at 312; "[t]he warrants and the supporting affidavit here show that officers were thorough in describing the profile to be searched, the information to be disclosed, the evidence to be seized, and the specific crimes they sought to investigate," *Burkhow*, 2020 WL 589536, at *12; and, if probable cause were missing as to certain data, it was "not an open and shut matter" given the absence of specific guidance on the standards governing warrants authorizing the search and seizure of social media data in the reported decisions of the First Circuit, *United States v. Blake*, 868 F.3d 960, 975 (11th Cir. 2017); *see also Burkhow*, 2020 WL 589536, at *12 ("The extent to which social media profiles can be searched is an evolving issue . . . ."); *Chavez*, 423 F. Supp. 3d at 208 ("[A]pplying the Fourth Amendment to social media accounts is a relatively unexplored area of law with nuances that have yet to be discovered. Courts should not punish law enforcement officers who are on the frontiers of new technology . . . . (citation omitted)).[7]

---

[7] I note that if probable cause were missing for some of the categories of information that Facebook disclosed *and* the good-faith exception did not apply, Daprato's requested remedy—suppression of all evidence seized from his Facebook account—would not be justified. "Under our precedent, 'the remedy in the case of a seizure that casts its net too broadly is not blanket suppression but partial suppression." *United States v. Aboshady*, 951 F.3d 1, 9 (1st Cir. 2020) (alterations omitted) (quoting *United States v. Falon*, 959 F.2d 1143, 1149 (1st Cir. 1992)). "If the scope of the government's search was too broad, [a defendant] would only be entitled to suppression of [evidence] . . . that reasonably fell outside the scope of the warrant unless the 'lawful and unlawful parts of the search are inextricably intertwined or where the lawful part seems to have been a kind of pretext for the unlawful part.'" *Id.* (quoting *United States v. Young*, 877 F.2d 1099, 1105 (1st Cir. 1989)).

Because Officer Kassa had an objectively reasonable basis to rely on the search warrant issued by the Magistrate Judge, the good-faith exception to the exclusionary rule also supports the denial of Daprato's suppression motion.

## V.  CONCLUSION

Daprato's Motion to Suppress (ECF No. 179) is **DENIED**.

**SO ORDERED.**

Dated:  May 2, 2022

                                                            **/s/ JON D. LEVY**
                                      **CHIEF U.S. DISTRICT JUDGE**